IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-01179-MSK-KMT

QDOBA RESTAURANT CORPORATION,

    Plaintiff and Counterclaim Defendant,

v.

TAYLORS, LLC,

    Defendant and Counterclaimant.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on Plaintiff Qdoba Restaurant Corporation's ("Qdoba") Motion for Summary Judgment **(#83)**, to which Defendant Taylors, LLC ("Taylors") responded **(#89)**, and Qdoba replied **(#98)**. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

## I. Jurisdiction

The Court exercises diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

## II. Material Facts

Having reviewed all of the parties' submissions, determined the undisputed facts construed any disputed fact most favorably to the Taylors as the non-movant, the Court finds the material facts to be as follows.

Qdoba's franchises and operates a nation-wide system of Qdoba Mexican Grill restaurants. Its website states that Qdoba restaurants have "excellent sales-to-investment ratios" and "33 consecutive quarters of same-store sales growth."

In October 2005, Qdoba entered into a Development Agreement with Taylors. Under the Development Agreement, Taylors was given the exclusive right develop, open, and operate seven Qdoba restaurants in Monroe, Miami-Dade, Broward, and Palm Beach counties, all in the Southern Florida market. The Development Agreement further specified a schedule for opening the restaurants. At the time each restaurant opened, the Development Agreement required the execution of a specific Franchise Agreement governing the specific individual restaurant. Taylors ultimately opened four restaurants under the Development Agreement, generally referred to as South Miami (September 18, 2006), Miracle Mile (opened June 13, 2007), Dixie Highway (opened July 30, 2007), and Coconut Grove (opened February 8, 2008). Taylors signed leases for the three additional restaurants required and authorized under the Development Agreement, but never opened these restaurants. Additionally, Taylors purchased seven restaurants in North Florida from another franchisee.

With regard to the South Florida location, in October 2006 and in February 2007, Qdoba's real estate agent Kevin Greve[1] provided Taylors with colored demographic maps, produced by a program called MapInfo. Qdoba had used this program for the purpose of evaluating potential locations for restaurants. Each map displayed areas that were color coded according to the projected sales for a potential restaurant located in that area. Each of five color codes represented a range of potential sales. The parameters of each range was set by the MapInfo program. The sales projections were based on actual sales information and site characteristics from operating Qdoba restaurants, surveys of actual Qdoba customers, and

---

[1] The parties dispute whether Mr. Greve was Qdoba's authorized agent. However, construing the facts most favorably to the Taylors, the Court assumes that the scope of his authority included providing the maps to the Taylors.

information about competitive restaurants and other businesses near existing Qdoba restaurants. Taylors relied on the maps in selecting the sites of the three restaurants that it opened in South Florida and the three restaurants for which it signed leases but never opened.

In December 2006, Taylors also purchased seven Qdoba restaurants in North Florida from a Qdoba franchisee, ZT Enterprises, LLC ("ZT"). As part of its due diligence, Taylors visited the restaurants and had access to the financial information for each. The Taylors state that Richard Pugh, Qdoba's Chief Executive Officer, represented to them that the locations of the restaurants were excellent and that the current financial state of the seven restaurants did not reflect their true sales potential because the current owner was poorly managing them. Taylors also states that Mr. Pugh "emphatically" agreed with Rene Prats' (a member of Taylors) assessment that Taylors could increase sales in the North Florida restaurants by 20-30 percent. Taylors relied on Mr. Pugh's representations concerning the sales potential of the North Florida restaurants and the MapInfo projections in deciding to purchase the seven North Florida restaurants.

Shortly after closing the sale, Taylors closed one of the restaurants in North Florida. By September 2007, Taylors were concerned with the performance of the other Qdoba restaurants. The North Florida restaurants had not shown sales improvement, and the Miracle Mile and Dixie Highway restaurants in South Florida did not open with sufficient sale numbers. Mr. Prats complained to Mr. Pugh on September 17, 2007 that the sales of Taylors' restaurants were not as high as the MapInfo projections. Nevertheless, Taylors commenced construction of the Coconut Grove restaurant in October 2007, and opened it in February 2008. It, too, failed to perform in accordance with Taylors' expectations.

In July 2008, Taylors closed seven restaurants.[2] Taylors continues to operate three restaurants: South Miami in South Florida and Governor's Square and St. Johns in North Florida.

### III. Issues Presented

Qdoba asserts two claims in the Second Amended Complaint **(#35)**: (I) a claim for a declaration that it made no false representations to Taylors; and (ii) a claim for Taylors' breach of specified Franchise Agreements by closing the restaurants that were the subject of the Agreements.[3]

Taylors asserts five counterclaims **(#41)**: (I) fraudulent inducement in entering the Development Agreement and Franchise Agreements; (ii) negligent misrepresentation regarding the same transactions; (iii) violation of the Florida Franchise Act, Fl. Stat. § 817.416(1)(b), in that Qdoba misrepresented the "prospects for success" of the franchises; (iv) violation of the Florida Deceptive and Unfair Trade Practices Act, Fl. Stat. § 501,201 *et seq.*,(FDUTPA claim) in that Qdoba "disseminated [misleading] financial performance representations"; and (v) violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-105 *et seq.,*(CCPA claim) for the same reasons.

---

[2] The seven closed restaurants are numbered 133 (1620 Margaret Street, Jacksonville), 191 (8635 Blanding Blvd., Jacksonville), 423 (266 Miracle Mile, Coral Gables), 494 (2982 Grand Ave, Coconut Grove), 118 (1350 West Tennessee Street, Tallahassee), 132 (2264 North Monroe Street, Tallahassee), and 468 (11421 S. Dixie Highway, Miami).

[3] Qdoba does not assert a claim based on breach of the Development Agreement. Although Qdoba's factual allegations suggest that it could have asserted such a claim, it did not do so as evidenced by the clear language of the Second Amended Complaint **(#35)** and the parties's approved Amended Final Pretrial Order **(#113)**, which states that "Qdoba claims that Taylors breached seven franchise agreements by closing the related restaurants in July 2008").

Because the breach of the Franchise Agreements is closure of restaurants, this claim is necessarily limited to the seven restaurants that Taylors has closed. Thus, there is no issue as to a breach of contract for the three restaurants that remain open: South Miami, Governor's Square, and St. John.

Qdoba has moved for summary judgment as to all claims and counterclaims. As to its claims, it has the burden of proof. As to the Counterclaims, Taylors has the burden of proof. The parties agree that Colorado law governs Qdoba's breach of contract claim and Taylors' CCPA counterclaim and Florida law governs the remainder of Taylors' counterclaims.

## IV. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When, as with respect to Qdoba's claims, the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to

5

avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

When, the moving party does not have the burden of proof at trial, as with respect to Taylors' counterclaims, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## V. Analysis

At the core of the claims and counterclaims in this case, is the question of whether Qdoba misrepresented facts in the form of sales projections to Taylors as an inducement to enter the Development Agreement for the South Florida restaurants and to execute the Franchise Agreements for the North Florida restaurants.[4] Thus, the Court turns first to Taylors' counterclaims.

---

[4] For example, Qdoba contends that Taylors breached Franchise Agreements by closing various Qdoba restaurants. To prevail on its claim for breach of contract under Colorado law, Qdoba must demonstrate four elements: (1) existence of a contract; (2) performance by Qdoba; (3) failure to perform by Taylors; and (4) resulting damages to Qdoba. *See Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). In response, Taylors alleges that the Franchise Agreements are void because they were fraudulently induced by Qdoba's provision of the inaccurate MapInfo projections.

6

A.   Counterclaims

To demonstrate fraud in the inducement under Florida law, Taylors must present facts sufficient to prove that (1) Qdoba misrepresented a material fact; (2) Qdoba knew or should have known of the falsity of the statement; (3) Qdoba intended that the representation would induce another to rely and act on it; and (4) Qdoba suffered injury as a result of its justifiable reliance on the representation. *See Biscayne Inv. Group v. Guar. Mgmt. Servs.*, 903 So.2d 251, 255 (Fla. Dist. Ct. App. 2005). Whether a party has made intentional fraudulent inducements is a question of fact. *See D & M Jupiter, Inc. v. Friedopfer*, 853 So.2d 485, 487 (Fla. Dist. Ct. App. 2003). Although generally summary judgment is not appropriate to resolve a fraud claim under Florida law, there are circumstances in which summary judgment is appropriate. *See Rose v. ADT Sec. Servs., inc.*, 989 So.2d 1244, 1247 (Fla. Dist. Ct. App. 2008) (granting summary judgment when the plaintiff could not show reliance).

The factual misrepresentations that Taylors claim were made by Qdoba are: Qdoba's website's statements that Qdoba restaurants offer an excellent sales-to-investment ratio and that Qdoba has seen 33 consecutive quarters of single restaurant growth, the MapInfo sales projections, Mr. Pugh's representations to Taylors that the North Florida restaurants were in excellent locations and poor sales records were attributable to the restaurants being poorly managed, and Mr. Pugh's agreement with Mr. Prats that Taylors could increase the sales of the North Florida restaurants.

As to the website's statements, Taylors has provided no evidence that would establish that the statements are untrue. Taylor's contention that it did not experience an excellent sales-to-investment ratio or consecutive quarters of growth does not address the truth or falsity of the

statement at the time it was made. Furthermore, Taylors provides no evidence that the website statements particularly related to the North Florida existing franchises, and because such statements referred to operating restaurants, they could not pertain to undeveloped restaurants in South Florida. As a consequence, Taylors has not presented sufficient evidence to demonstrate a genuine issue of material fact based upon the website statements.

Under Florida law, the MapInfo sales projections are considered to be opinions, as compared to statements of fact. Reliance upon opinions is insufficient to support a fraud claim. *See Baker v. United Servs. Auto. Ass'n*, 661 So.2d 128, 131 (Fla. Dist. Ct. App. 1995). Parties to a business transaction are generally not entitled to rely on opinions, judgments, or legal views expressed by an opposing party. However, if the person expressing the opinion is one who has superior knowledge of the subject of the statement and the plaintiff can show that the person knew or should have known that the statement was false, then the opinion may be treated as a statement of fact and, therefore, may form the basis for a fraud claim. *See Meijia v. Jurich*, 781 So.2d 1175, 1178 (Fla. Dist. Ct. App. 2001). For purposes of this analysis, and without determining its applicability, the Court will assume that this exception applies to the MapInfo projections.[5]

Taylors argues that the falsity of the mapped sales projections can be inferred from the discrepancy between the highest range of potential sales revenues on the MapInfo maps and the average sales of existing corporate-owned Qdoba restaurants. After carefully reviewing the

---

[5] The Court understands Taylors' argument regarding Qdoba's duty to disclose to be an attempt to fit the sales projections into this exception. To the extent that Taylors is independently alleging fraudulent concealment, the claim fails because Taylors had the very information that it complains was not disclosed. It contends it did not have actual sales figures, but the actual sales figures it identifies were essentially the same as the sales projections contained in the MapInfo maps.

record, the Court finds that Taylors has presented insufficient evidence to support this inference.

First, the comparison of the highest range of projected sales revenues of franchised restaurants to the average sale revenues of existing corporately owned restaurants appears to be a comparison of apples and oranges. Two aspects of the comparators do not match. By definition, an average sales rate is derived from the highest and lowest sales rates. Thus, conceptually, a difference between the average sales revenue and the highest range of sales revenue should be expected, and the existence of a difference does not lead to an inference that the projected sale revenues were false. In addition, the average figure is derived from corporately owned restaurants and the projected sales is either for franchised restaurants or a combination of franchised and corporately owned restaurants. Absent evidence that sales are the same for corporate and franchised restaurants, actual sales for one type may have limited or no correlation to projections for the other type. Finally, there are no corporately-owned restaurants in Florida, and there is no evidence to establish that actual sales for corporately owned restaurants in other states correlated to the potential sales in Florida.

However, assuming that the actual sales of corporately owned restaurants in other states can be generally compared to projections for franchised restaurants in Florida, Taylors fails to present evidence that would establish which projection was inaccurate and by how much. The only evidence offered is that Taylors' restaurants did not perform in accordance with the projections. This is insufficient, by itself, to create an inference that the projections were false at the time they were made and that Qdoba knew that they were false.

Taylors raises two other additional arguments with regard to the falsity of projections, but neither is supported by the record. First, Taylors argues that the sales projections were nothing

9

more than random numbers.  The portion of the record to which Taylors cites in support of this allegation is testimony about how the MapInfo program prepared the maps.  Such testimony does not indicate that the sales projections figures used by the MapInfo were random.  Instead, the testimony was that the MapInfo program randomly selected the *parameters* for the sales projection ranges.  Second, Taylors argues that Mr. Greve testified to the inaccuracy and unreliability of the MapInfo projections.  The record reveals that Mr. Greve did not testify that the MapInfo projections were inaccurate; rather, he stated that in his opinion all sales forecasts were inherently unreliable and, therefore, he did not rely on them.

Finally, with respect to Mr. Pugh's statements to Mr. Prat regarding the North Florida restaurants, Taylors has not presented any evidence to establish that such statements were false.  Mr. Pugh stated that the location was excellent and that the restaurants were being poorly managed.  He also agreed with Mr. Prat's projection that Taylors could increase sales by 20–30 percent.  Taylors points to no evidence in the record that these statements were false when made, or that Mr. Pugh knew them to be false.  Evidence that Taylors was not able to increase sales does not create and inference that these statements were false and known to be false at the time they were made.

Taylors has not come forward with sufficient evidence to demonstrating that Qdoba misrepresented material facts in conjunction with the Development Agreement and Franchise Agreements.  As a result, Qdoba is also entitled to summary judgment on all of Taylors' counterclaims. [6]

---

[6] This is because each counterclaim contains an element requiring proof of a misrepresentation. Negligent misrepresentation requires a showing of (i) misrepresentation of material fact; (ii) the representor either know of the misrepresentation, made the representation without knowledge as to its truth or falsity, or made the representation under circumstances in which he ought to have known of its

B.   Breach of Contract

Recalling that Qdoba's breach of contract claim is limited to breaches of the Franchise Agreements for the seven restaurants that Taylors closed, the Court returns to Qdoba's breach of contract claim. There is no dispute that the parties entered into Franchise Agreements for each of the seven closed restaurants[7], that Qdoba performed as bargained, or that Taylors failed to perform under the Franchise Agreements by closing the restaurants.[8]

As an affirmative defense, Taylors argues that its ability to perform was frustrated or prevented. In essence, Taylors argues that because the restaurants were not profitable, it was not obligated to perform under the Franchise Agreements.

This defense is unavailing. Under both Colorado and Florida law, the defense of

---

falsity; (iii) the representor intended that the representation induce another to act on it; and (iv) the plaintiff was injured from acting in justifiable reliance on the misrepresentation. *See Rocky Creek Ret. Props. v. Estate of Fox*, 19 So. 3d 1105, 1110 (Fla. Dist. Ct. App. 2009). Similarly, a violation of the Florida Franchise Act requires an intentional misrepresentation of the prospects or chances of for success of a proposed or existing franchise or distributorship. *See* Fla. Stat. § 817.416; *KC Leisure, Inc. v. Haber*, 972 So.2d 1069, 1075 (Fla. Dist. Ct. App. 2008).

Taylors' claims under the Florida Deceptive and Unfair Trade Practices Act and the Colorado Consumer Protection Act are premised upon misrepresentations of sales potential. Thus, to establish a violation of the Florida Deceptive and Unfair Trade Practices Act requires proof of (i) a deceptive act; (ii) causation; and (iii) actual damages. *See Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F.Supp.2d 1350, 1364 (M.D. Fla. 2007). To establish a violation of the Colorado Consumer Protection Act, a plaintiff must show (i) a deceptive trade practice; (ii) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (iii) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (iv) the plaintiff suffered injury in fact to a legally protected interest; and (v) the challenged practice caused the plaintiff's injury. *See Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 155 (Colo. 2007).

[7] The determination in favor of Qdoba on Taylors' counterclaim for fraud in the inducement is dispositive with regard to Taylors affirmative defenses that the Development Agreement and the Franchise Agreements were void *ab initio* due to fraud.

[8] Under Section 29 of the Franchise Agreements, Taylors, as the franchisee, is deemed to be in default under the Agreement if it "at any time ceases to operated the Franchised Business for a period of five (5) days or otherwise abandons the Franchised Business."

frustration of purpose requires more than unprofitability of an enterprise; it requires frustration that is so severe as to not be within the risks assumed under the contract, *i.e.*, complete frustration of the essential purpose of the contract. *See Beals v. Tri-B Assocs.*, 644 P.2d 78, 80–81 (Colo. Ct. App. 1982); *Valencia Ctr., Inc. v. Publix Super Markets, Inc.*, 464 So.2d 1267, 1269 (Fla. Dist. Ct. App. 1985). The frustration of purpose defense is not available if the event allegedly frustrating the purpose of the contract was foreseeable at the time the parties entered in the to agreement and the parties could have addressed the issue in the their bargaining. *See Beals*, 644 P.2d at 80–81; *Brink v. Bank of Am., N.A.*, 811 So. 2d 751, 753 (Fla. Dist. Ct. App. 2002).

Here, the profitability of the restaurants was squarely within the consideration of the parties at the time Taylors executed the Franchise Agreements. Indeed, it was the subject of discussion between Mr. Pugh and Mr. Prats. Furthermore, with respect to the South Florida restaurants, Taylors admits that it was a consideration in choosing locations. The fact that the restaurants were not as profitable as both parties had hoped does not excuse Taylors' performance. Were that the case, then Taylors would have the right to unilaterally rescind the Franchise Agreement if the restaurants did not produce the revenue stream it desired, thereby negating the purposeful language of the Agreements. Thus, the Court concludes that there is no genuine dispute as to whether Taylors breached the Franchise Agreements.

There is a dispute, however, as to damages. The Franchise Agreements provide that Qdoba is entitled to a royalty payment of 5% of the gross sales of each restaurant. Taylors argues that because the restaurants were unprofitable, Qdoba would have received no royalty payments had Taylors continued to operate them and therefore it has suffered no injury due to

their closure.  Under Section 3.2 of the Franchise Agreements, however, base the royalty payments on the gross sales[9] and not profits.  Thus, unless the restaurants were expected to have no sales,  Qdoba would be entitled to receive a royalty payment.  Quantification of the sales that would have been generated had the restaurants not been closed is a factual matter to be determined at an evidentiary hearing.

    **IT IS THEREFORE ORDERED** that

(1) Plaintiff Qdoba Restaurant Corporation's Motion for Summary Judgment **(#83)** is **GRANTED**.

(2) Summary judgement shall enter in favor of  Qdoba Restaurant Corporation and against Taylors, LLC on Taylors' counterclaims for fraud in the inducement, negligent misrepresentation, violation of the Florida Franchise Act, violation of the Florida Deceptive and Unfair Trade Practices Act and violation of the Colorado Consumer Protection Act.

(3) A summary determination is made that Taylors, LLC breached the Franchise Agreements by closing the Qdoba restaurants numbered 133 (1620 Margaret Street, Jacksonville), 191 (8635 Blanding Blvd., Jacksonville), 423 (266 Miracle Mile, Coral Gables), 494 (2982 Grand Ave, Coconut Grove), 118 (1350 West Tennessee Street, Tallahassee), 132 (2264 North Monroe Street, Tallahassee), and 468 (11421 S. Dixie Highway, Miami).   The issue of damages shall be determined at an evidentiary hearing.

---

[9] Under Section 3.4 "gross sales" includes "all revenue from the sale of services and products and all other income of every kind and nature related to the Franchised Business."

(4)     The parties shall jointly contact chambers within ten days of this Order to set such evidentiary hearing.

Dated this 23rd day of March, 2010

**BY THE COURT:**

Marcia S. Krieger
United States District Judge